UNITED STATES, Appellee

v.

CLIFFORD SPERLAND, Private, U. S. Army, Appellant

1 USCMA 661, 5 CMR 89

No. 366

Decided September 3, 1952

1st Lt. Richard M. Hartsock, USA, for Appellant.

Lt. Col. Paul J. Leahy, USA, and 1st Lt. Richard L. Brown, USA, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

The petitioner was tried in Korea upon two charges. The specification under the first charge alleged absence without leave in violation of the Uniform Code of Military Justice, Article 86, 50 USC § 680. The specification under the second charge alleged misbehavior before the enemy in violation of the Uniform Code of Military Justice, Article 99, 50 USC § 693. The wording of the specification of the latter charge is as follows:

". . . that Private Clifford Sperland, U. S. Army, Heavy Mortar Company, 24th Infantry Regiment . . . did . . . on or about 20 July 1951, in the presence of the enemy run away from his company, and did not return thereto until apprehended by Military Police."

The general court-martial found accused guilty of the charges and specifications and sentenced him to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for forty years. The convening authority reduced the period of confinement to twenty years and a board of review affirmed. The case now is before us for review on the single issue of whether the evidence was sufficient to sustain the findings of guilty of the charge of misbehavior before the enemy.

The facts bearing upon that issue are as follows. The accused was a member of the Heavy Mortar Company, 24th Infantry Regiment. Specifically, he was performing the duties of an assistant ammunition bearer. It was his responsibility to carry ammunition from a near-by truck to the gun emplacements whenever necessary, and, in addition, when not busy bringing rounds forward, to pull the pins on the mortar shells prior to their being fired. It was not one of his duties to go back to the dump with the truck and haul ammunition to the gun position. At the time in question, the heavy mortar company was 700 to 800 yards in the rear of the front lines with a mission of supporting the first battalion of the 24th Infantry Regiment. The mortars of the company had been in position for about ten days and during that time had fired on the enemy. However, the guns had not been fired for approximately three days before the date of the alleged offense and the infantry troops were principally engaged in patrol and reconnaissance activities. On the evening of July 20, 1951, the accused who had been previously restricted to the company area and who had not been given permission to leave was reported missing from the evening mess line by his platoon sergeant. The sergeant and his platoon leader then searched the entire company area and could not find him. Later that same evening, he was apprehended by the military police forty miles south of the company position area. Accused elected to testify and he gave the following account of his activities during this absence: that he wanted to go to the dispensary and had intended asking his captain's permission; that on arriving at the command post he could not find the officer; that he found the captain's driver who offered to take him to the dispensary in his jeep; that after his acceptance of the offer, they proceeded to the dispensary, a distance of from 10 to 15 miles to the rear of the platoon area; that after making this stop, they continued to the Heavy Mortar Company Rear Command Post still farther away from the front lines; that from there the accused and the driver went to the regimental service company area (100 yards distance from the Heavy Mortar Company Rear Command Post and approximately 20 to 25 miles from the forward area); and, that they took a truck from the service area and headed south toward Seoul, where they were apprehended by the military police. Other evidence shows that they had appropriated the truck for their own use, were being pursued, and were stopped by military police thirteen miles to the south of where they had taken the truck. They were

taken to the Provost Marshal's Office and accused was subsequently returned to his company.

The offense of misbehavior, in so far as material here, is set out in the Uniform Code of Military Justice, supra, as follows:

"ART. 99. Misbehavior before the enemy.

"Any member of the armed forces who before or in the presence of the enemy—

(1) runs away; or

. . . . . . . .

shall be punished by death or such other punishment as a court-martial may direct."

The offense of misbehavior before the enemy is one of the earliest military offenses. It has been recognized in our military law since Revolutionary War times (see Article 12, Section XIII, American Articles of War 1776). Because of the historical development of the offense and the similarity in the wording of the punitive articles defining the crime, we are furnished with the early explanation of the terms "before the enemy" and "running away."

In discussing "before the enemy" Colonel Winthrop at page 623 of his Military Law and Precedents, Second Edition, 1920 Reprint, has this to say:

"This term is defined by Samuel as—'in the face or presence of the enemy.' It is not necessary, however, that the enemy should be in sight. If he is confronting the army or in its neighborhood, though separated from it by a considerable distance, and the service upon which the party is engaged, or which he is especially ordered or properly required by his military obligation to perform, be one directed against the enemy, or resorted to in view of his movements, the misbehavior committed will be 'before the enemy' in the sense of the Article."

The early Manuals for Courts-Martial, U. S. Army, do not discuss the phrase; however, in the 1928 Manual this is said:

". . . Whether a person is 'before the enemy' is not a question of definite distance, but is one of tactical relation. For example, where accused was in the rear echelon of his battery about 12 or 14 kilometers from the front, the forward echelon of the battery being at the time engaged with the enemy, he was guilty of misbehavior before the enemy by leaving his organization without authority although his echelon was not under fire. On the other hand, an organization some distance from the front, and which is not a part of a tactical movement then going on or in immediate prospect, is not 'before the enemy' within the meaning of this article."

The explanation expressed above is identical with that found in the 1949 Manual with the exception of the example used. The example used in the 1949 Manual is the one found in paragraph 178, Manual for Courts-Martial, United States, 1951, which discusses the term in the following language:

". . . Whether a person is 'before the enemy' is not a question of definite distance, but is one of tactical relation. For example, a member of an antiaircraft gun crew charged with opposing anticipated attack from the air, or a member of a unit about to move into combat may be before the enemy although miles from the enemy lines. On the other hand, an organization some distance from the front or immediate area of combat which is not a part of a tactical operation then going on or in immediate prospect is not 'before or in the presence of the enemy' within the meaning of this article."

The slight differences in the wording of the sections and the examples given reflect principally the difference in the military tactics of the time. It may not be possible to carve out a general rule to fit all situations, but if an organization is in position ready to participate in either an offensive or defensive battle, and, its weapons are capable of delivering fire on the enemy and in turn are so situated that they are within effective range of the enemy weapons, then that unit is before the enemy.

We need not concern ourselves with organizations in reserve, units in rear areas or troops not participating in tactical operations. In the instant case we need go no further than to say that a mortar unit in direct support of front line infantry troops, with a reasonable possibility of being called on for fire support to repel an attack or assist an advance, is "before the enemy" as that phrase is used in Article 99 of the Uniform Code of Military justice, supra.

This brings us to a consideration of what is the meaning of the phrase "runs away" as used in the same ▇ Article. This term must connote some form of fleeing from an ensuing or impending battle. It seems unrealistic to assume that every unauthorized absence from any unit which might be considered in the presence of the enemy constituted misbehavior. On the other hand it appears that to limit the phrase to flight from fear or cowardice is too restricted. It would appear to be more in keeping with the offense, if an intent to avoid combat, with its attending hazards and dangers is considered as an essential part of running away. Previous army cases and military authorities have announced a similar rule and the present Manual appears to have adopted the concepts expressed by them.

Colonel Winthrop, in his Military Law and Precedents, supra, at page 624, defines running away in the following manner:

> "RUNNING AWAY. This is merely a form of misbehavior before the enemy, and the words 'runs away' might well be omitted from the Article as surplusage. Barker, an old writer cited by Samuel, says of this offense:— 'But here it is to be noticed that of fleeing there be two sorts; the one proceeding of a sudden and unlooked for terror, which is least blameable; the other is voluntary, and, as it were, a determinate intention to give place unto the enemy —a fault exceeding foule and not excusable.'"

A recent army case, White v. United States, 10 BR–JC 117, reaches the conclusion that fear or cowardice is not the only measure by which you test whether a soldier "runs away" but that leaving with an intent to avoid combat service or duty so closely related thereto as to involve physical danger is sufficient to meet the standards. The Judicial Council in that case held:

> "The only question presented by the evidence is whether the four accused or any of them 'ran away' in the sense of Article of War 75. It is apparent to us that the expression 'run away' as used in Article of War 75 imports not only absenting oneself from his unit without authority, but also an accompanying intent to avoid either combat service or duty so directly related thereto as to involve physical danger to the individual concerned. Such is the implication of the provision in the Manual for Courts-Martial, 1949, that 'Misbehavior is not confined to acts of cowardice. . . . Running away is but a particular form of misbehavior specifically made punishable by this article' (par. 163a, p 216). . . .
>
> "An examination of the numerous cases involving the charge of running away in violation of Article of War 75 confirms this view (see, for example, CM ETO 1404, Stack, 4 BR (ETO), 279,281; CM ETO 1659, Lee, 5 BR (ETO) 173, 174; CM 285209, Ison, 5 BR (ETO) 185, 188; CM 290632, Skovan, 13 BR (ETO) 321, 325). . . . ."

Following these authorities we adopt the principle that the phrase "runs away" must be interpreted as an absence under conditions from which it may be reasonably inferred that the leaving was with intent to avoid some form of combat action by or with the enemy. With this rule as a guide we look to the record to determine whether there is evidence to sustain a finding that the accused ran away.

The evidence to support the finding made by the court-martial can be gathered from the following ▇ facts and circumstances. The Heavy Mortar Platoon was emplaced well forward to support a front-line battalion of infantry. That unit was in contact with the enemy and

patrol and reconnaissance activities were being carried on. The mortar positions were such that enemy artillery and automatic weapons could easily reach their location. The troops had to maintain a state of readiness as an attack by the enemy at any time was a distinct possibility. While the mortar platoon had gone through a short period of relative inactivity, there was no assurance that enemy fire might not be brought to bear on the platoon position. Accused was a necessary member of the gun crew and the carrying out of his duties involved hazards and risks. Moreover, he had been confined to his company area which kept him well within the range of enemy weapons. His departure to the rear would secure him from the dangers attendant upon his duties. He surreptitiously departed from the danger area, proceeded well to the rear, where he appropriated a vehicle without authority, and was fleeing farther away from his unit when he was apprehended by the military police. These facts permit the court-martial to reasonably find that by going absent he intended to avoid the hazards and risks involved in combat. While he assigns a different reason for his behavior, the ring of sincerity is hollow, but even if his explanation was plausible, it would only raise a question of fact which the court-martial resolved against him.

The decision of the Board of Review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.