UNITED STATES, Appellee

v.

HERMAN M. CAREY, Corporal, U. S. Army, Appellant

4 USCMA 112, 15 CMR 112

No. 3097

Decided April 2, 1954

Lt Col George M. Thorpe, U. S. Army, 1st Lt Arnold H. Craine, U. S. Army, and 1st Lt Lee J. Rosch, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, and 1st Lt Joseph C. Chandler, U. S. Army, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

Upon common trial by general court-martial in Korea, Corporal Herman M. Carey, and Private First Class Herman W. Clark, were convicted of misbehavior before the enemy, in violation of Article 99, Uniform Code of Military Justice, 50 USC § 693. The accused, Corporal Carey, was sentenced to bad conduct discharge, total forfeitures, and confinement at hard labor for three years. Private Clark was sentenced to bad conduct discharge, total forfeitures, and confinement at hard labor for one year. The convening authority approved the findings and sentences, but suspended the execution of the sentence imposed upon Clark for six months with a provision for remission at the expiration of that period. The board of review affirmed these actions, and the accused, Carey, petitioned this Court for review on the ground of insufficiency of the evidence to support the findings. We granted the petition to determine the issue thus raised.

The material facts are as follows: On December 3, 1952, the 9th Infantry Regiment was in position on the main line of resistance in Korea. Twenty-two tanks were arrayed immediately in front of the regiment with the mission of maintaining a defensive position and providing fire support for friendly patrols in their respective sectors. The accused, Carey, was commander of a tank supporting Company B. As such he was responsible for its operation and mechanical condition, and was in charge of the crew. Normally, the crew consisted of five men, including the commander. However, on the day in question, there were only four in the crew. When not on duty, the members were permitted to sleep in a bunker near the tank, but they could not leave the immediate vicinity. While in the area, the crew was on constant alert and each man was required to assume his assigned station when a call to supply fire support to a patrol was received. This tank was located 2500 yards from the Communist lines, and was within artillery, mortar, and sniper range.

During the day, Versteeg, a crew member went to the rear to obtain gasoline for the tank. While there, he purchased five bottles of whiskey with funds supplied by the accused and at his direction. By rule of the Tank Company, whiskey was prohibited in the front lines. That night Clark reported enemy activity to the Tank Company command post. His suspicions aroused by Clark's manner, the accused's platoon leader investigated the report and learned it was unfounded. The officer then went to the tank position where he discovered that both Clark and Carey were intoxicated. When the Tank Commander arrived at the site to relieve the accused, the latter was in such a stupor that he could not be aroused for a half-hour.

As a result of this conduct, Carey and Clark were charged with misbe-

havior before the enemy. The specification of the charge against Carey alleged that he:

". . . did, at APO 248, on or about 3 December 1952, before the enemy, endanger the safety of his unit, Tank Company, 9th Infantry Regiment, which it was his duty to defend, by intentional misconduct in that he became drunk while on duty as Tank Commander."

At the trial the evidence established that during that period patrols from Company B were operating in front of their lines, but did not require any support from the accused's tank. It was also indicated that no necessity for repelling hostile advances arose during the night.

In his single assignment of error, the accused contends that intoxication alone does not constitute the offense of misbehavior. He argues that Article 99 of the Code, supra, requires proof either that the condition of intoxication was induced for the purpose of evading combat, or that the accused intended thereby to endanger his unit. In support of this position the defense relies upon excerpts from Samuel's History of the British Army, London, 1816, pages 597–598, and Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 623. In the absence of a showing of either state of mind, the argument concludes, the evidence is legally insufficient to support the finding of the court-martial.

As originally enacted the American Articles of War of 1776, provided:

"Section XIII

"*Art.* 13. Whatsoever officer or soldier shall misbehave himself before the enemy, and run away, or shamefully abandon any fort, post or guard, which he or they shall be commanded to defend, or speak words inducing others to do the like; or who, after victory, shall quit his commanding officer, or post, to plunder and pillage . . . shall suffer death, or such other punishment, as, by a general court-martial, shall be inflicted on him.

"*Art.* 14. Any person, belonging to the forces of the United States, who shall cast away his arms and ammunition, shall suffer death, or such other punishment as shall be ordered by the sentence of a general court-martial."

The general provisions of these Articles were combined in Article 52 of the 1786 Articles of War which authorized the imposition of the death penalty "or such other punishment as shall be ordered by the sentence of a general court-martial." These provisions remained virtually unchanged until the Articles of War were revised by Chapter II, Act of June 4, 1920, 41 Stat 787. Although this enactment did not further define the term "misbehave himself," it did add a new provision relating to the endangering of a command "by any misconduct, disobedience, or neglect." Under the 1921 revision, Article of War 75, provided:

"ARTICLE 75. Misbehavior Before the Enemy.—Any officer or soldier who, before the enemy, misbehaves himself, runs away, or shamefully abandons or delivers up or by any misconduct, disobedience, or neglect endangers the safety of any fort, post, camp, guard, or other command which it is his duty to defend, or speaks words inducing others to do the like, or casts away his arms or ammunition, or quits his post or colors to plunder or pillage, or by any means whatsoever occasions false alarms in camp, garrison, or quarters, shall suffer death or such other punishment as a court-martial may direct."

Decisions of military tribunals, throughout the existence of the "misbehavior" article, consistently construed the term as encompassing any conduct not conformable to the standard of behavior before the enemy required by the custom of our arms. Manual for Courts-Martial, U. S. Army, 1921, paragraph 425; Manual for Courts-Martial, U. S. Army, 1928, paragraph 141; Manual for Courts-Martial, U. S. Army, 1949, paragraph 163. Numerous instances of acts constituting this offense are listed by Colonel Winthrop at pages 622 and 623 of his Precedents,

supra. In discussing misbehavior he states:

"The act or acts, in the doing, not doing, or allowing of which consists the offence, must be conscious and voluntary on the part of the offender. The mere circumstance that he is found in a condition of intoxication, when called upon to march or operate against the enemy, will not constitute the offence, unless such condition should have been induced for the express purpose of evading such service."

Samuel, in his History of the British Army, pages 597–598, similarly concludes that mere intoxication in the presence of the enemy, without more, does not constitute the offense. In his view, the offense is committed only when there is an abandonment of some positive or demonstrative duty.

It is evident that the guides thus fixed for determining guilt or innocence could be known only to one thoroughly acquainted with the decisions of military tribunals defining from time to time the standard of behavior before the enemy. Recognizing that this was an unsatisfactory method of determining the elements of a capital offense, Congress eliminated from the Uniform Code of Military Justice the general term "misbehaves himself." Moreover, it took this action only after a clear demonstration of the historical background of the term had been presented to it in a vigorous attempt by The Judge Advocate General of the Army to preserve it as a part of the Uniform Code. Hearings before Senate Committee on Armed Services, 81st Congress, 1st Session, on S 857 and HR 4080, page 275. In Article 99 of the Code, supra, the acts constituting misbehavior before the enemy are set out in eight categories. By combining the provisions of Article of War 75 and Article 4 (paragraphs 12–20) of the Articles for the Government of the Navy, 31 USC § 1200, this Article seeks to particularize the conduct proscribed and to provide clear standards by which violations may be determined.

Insofar as it is pertinent to this case, Article 99, supra, provides:

"Any member of the armed forces who before or in the presence of the enemy—

. . . . . .

(3) through disobedience, neglect, or intentional misconduct endangers the safety of any such command, unit, place, or military property;

. . . . . .

shall be punished by death or such other punishment as a court-martial may direct."

As used in this Article, misconduct implies a wrongful intention, not a mere error of judgment. Manual for Courts-Martial, United States, 1951, paragraph 178d. The term contemplates "a transgression of some established and definite rule of action, where no discretion is left, except what necessity may demand; . . . a violation of a definite law." Manual for Courts-Martial, U. S. Army, 1921, paragraph 425 IV. Under the provisions of this Article, any disobedience, neglect, or intentional misconduct of a member of the armed forces, before or in the presence of the enemy, the natural and probable consequence of which is the endangering of the safety of any command, unit, place, or military property, which it is his duty to defend, constitutes misbehavior before the enemy. Thus the essential elements of this offense are correctly summarized by paragraph 178c, Manual for Courts-Martial, United States, 1951, as follows:

"(a) That it was the duty of the accused to defend a certain command, unit, ship, or place, or certain military property; (b) that he committed certain disobedience, neglect, or intentional misconduct, as alleged; (c) that thereby he endangered the safety of the command, unit, place, ship, or military property; and (d) that this act occurred while the accused was before or in the presence of the enemy."

In the instant case, the tank to which the accused was assigned as commander occupied a vital link in a defensive chain. The loss of that link endangered not only the infantry company to which it was attached, but also the safety of

**115**

other regimental units because of the havoc resulting from the rupture of a defensive line. The accused's duty to defend his unit, therefore, was clearly established by the general conditions shown to exist, as well as by the evidence of his assignment and of the mission of his tank. Similarly established was the element of "presence of the enemy." The unit was located in advance of an infantry company occupying positions on the main line of resistance; there were no friendly troops located between it and the enemy positions 2500 yards away; and it was required to furnish fire support for friendly patrols while well within range of hostile fire. United States v. Sperland, 1 USCMA 661, 5 CMR 89; United States v. Smith, 2 USCMA 197, 7 CMR 73. At a time when full responsibility for the operational efficiency of this vital defensive and offensive instrumentality was upon him, the accused voluntarily consumed sufficient liquor to intoxicate him. That such intoxication constitutes intentional misconduct there is no doubt, for drunkenness is a violation of Article 134 of the Code, supra, 50 USC § 728, and, when it occurs while on duty, it is a violation of Article 112 of the Code, 50 USC § 706. In that condition the accused was incapable of directing the operation of the tank, the delivery of fire support, or of defending his position against an enemy advance, should occasion arise. With Clark in the same condition, only two men were available to carry out the mission which ordinarily required the services of a crew of five. Under these circumstances, the safety of the unit was jeopardized, because the tank was out of action for all practical purposes, and the defensive chain was broken. This was the natural and probable consequence of the accused's intentional misconduct. Manual for Courts-Martial, United States, 1951, paragraph 138a.

Every essential element of the offense charged was established beyond a reasonable doubt. The evidence is legally sufficient to sustain the findings.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.