# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SALADINO, SCHASBERGER, and EWING[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant ROBERT B. BERGDAHL**
**United States Army, Appellant**

ARMY 20170582

Headquarters, United States Army Forces Command
Christopher T. Fredrikson and Jeffery R. Nance, Military Judges
Colonel Vanessa A. Berry, Staff Judge Advocate

For Appellant: Eugene R. Fidell, Esquire (argued); Stephen A. Saltzburg, Esquire; Sean T. Bligh, Esquire; Christopher L. Melendez, Esquire; Caitlin M. Snydacker, Esquire; P. Sabin Willett, Esquire; Captain Matthew D. Bernstein, JA; Eugene R. Fidell, Esquire (on brief, reply brief, and brief on specified issues).

For Appellee: Major Catharine M. Parnell, JA (argued); Lieutenant Colonel Eric K. Stafford, JA; Major Catharine M. Parnell, JA; Captain Allison L. Rowley, JA (on brief); Lieutenant Colonel Eric K. Stafford, JA; Lieutenant Colonel Wayne Williams, JA; Major Catharine M. Parnell, JA; Captain Allison L. Rowley, JA (on brief on specified issues).

16 July 2019

---------------------------------
OPINION OF THE COURT
---------------------------------

SCHASBERGER, Judge:

Appellant contends unlawful command influence [UCI] was so endemic to appellant's trial and the post-trial processing that appellant was denied a fair trial, or fair post-trial processing, or the appearance thereof. Appellant also alleges that the

---

[1] Judge Saladino and Judge Ewing decided this case while on active duty.

charge of misbehavior before the enemy failed to state an offense as drafted.[2]  We disagree.

Although there was some evidence of unlawful command influence adduced at trial and in the post-trial process, the government met its burden to demonstrate that an objective disinterested observer would not harbor a significant doubt as to the fairness of the proceedings.

A military judge sitting as a general court-martial convicted appellant, consistent with his pleas, of one specification of desertion to shirk hazardous duty and one specification of misbehavior before the enemy, in violation of Articles 85 and 99, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 885, 899 (2012). The military judge sentenced appellant to a dishonorable discharge, reduction to the grade of E-1, and forfeiture of $1,000 per month for ten months.  The convening authority approved the sentence as adjudged.

## BACKGROUND

On 30 June 2009, appellant walked off Observation Post (OP) Mest in Paktika Province, Afghanistan.  His plan was to walk to his higher headquarters at Forward Operating Base (FOB) Sharana to complain about the treatment of his platoon.  At the time appellant left his platoon, he knew he had guard duty and that he would likely be needed to serve on a convoy returning to FOB Sharana.  A few hours into his walk, appellant was captured by the Taliban.

When appellant missed his guard duty, his platoon began searching for him. They reported his absence, and his duty status was quickly changed to Duty Status Whereabouts Unknown (DUSTWUN).  The United States (U.S.) military, allies of the U.S., and other governmental agencies began a massive manhunt for appellant. Over the course of the manhunt, thousands of soldiers, sailors, airmen, marines, and civilians scoured Afghanistan, delaying and deferring other operations and turning air, ground, and electronic assets to the task of finding appellant.  Servicemembers suffered serious injuries while searching for appellant.[3]

---

[2] Appellant also raised two other assignments of error:  first, that the charges of desertion and misbehavior before the enemy were an unreasonable multiplication of charges for findings.  Second, that military judge erred in finding appellant's guilty plea to the charge of desertion to be provident.  We find no error in either the military judge's decision that the charges were not an unreasonable multiplication of charges for findings, or in his conclusion that appellant's guilty plea was knowing and voluntary, and met the elements of desertion to shirk hazardous duty.

[3] The government produced no evidence that anyone was ever killed searching for

(continued . . .)

Though appellant attempted to escape during the five years he was held captive, his attempts were not successful. In May 2014, the U.S. government exchanged appellant for five Taliban detainees who had been held at the U.S. detention facility in Guantanamo Bay, Cuba.

After his return to U.S. control, appellant went through a reintegration program and was eventually assigned to duty at Fifth Army Headquarters in San Antonio, Texas. The Commander, Fifth Army, was told that court-martial jurisdiction was retained at the four star level. The Director of the Army Staff appointed Major General (MG) Kenneth Dahl to investigate the facts surrounding appellant's departure from OP Mest.

The decision to exchange detainees for appellant was not without controversy. Both during the investigation and after, various individuals made comments regarding this exchange to include the Chairman of the Senate Armed Services Committee (SASC), the late Senator John McCain. Senator McCain made statements such as: "This decision to bring [appellant] home – and we applaud that he is home- is ill-founded . . . it is a mistake, and it is putting the lives of American servicemen and woman [sic] at risk. And that to me is unacceptable." Senator McCain continued to make statements regarding appellant including, "If it comes out that [appellant] has no punishment, we're going to have a hearing in the Senate Armed Services Committee."

Upon conclusion of the investigation, MG Dahl found that appellant left OP Mest with the intent to shirk important service. The Director of the Army Staff forwarded the investigation to the Commander, United States Army Forces Command, General (GEN) Robert Abrams, to take action. After charges were preferred, the preliminary hearing officer recommended the charges be referred to a special court-martial that could not adjudge a discharge. General Abrams referred the case to a general court-martial.

During the trial,[4] the defense made three separate motions regarding UCI. The first referred to the impact of Senator McCain's statements. At the time of the motion, Senator McCain was the Chairman of the SASC. After considering the evidence, including the testimony of the convening authority, GEN Abrams, the

---

(. . . continued)

appellant. The record indicates that there were several individuals injured, including serious injuries, while on missions whose primary purpose was to locate appellant, but no deaths were attributed to these missions.

[4] From arraignment to the announcement of sentence took almost two years. There was a voluminous amount of discovery material, classification and clearance issues, and various delays.

military judge concluded the defense did not meet its initial burden to show some evidence of UCI.

After President Trump's inauguration, the defense submitted a second motion to dismiss based on a claim of UCI. In it they raised the issue of comments made by Mr. Trump while he was campaigning for the presidency. To support their motion the defense compiled a twenty-eight minute video of statements by then candidate Trump.[5] These comments included statements such as:

> You tell me who makes these deals? It's like Sergeant Bergdahl, right? So we trade a dirty rotten traitor, where five or maybe even six people were killed when he deserted and we knew that they were killed and we knew he was a traitor. We trade for five of the greatest killers, the greatest killers in the Middle East. The five people that they wanted the most. That's our deal. So we get a traitor, and they get five people that are right now, most of them, already back on the battlefields trying to kill everybody including us . . . .

And:

> So we get this dirty, rotten, no-good traitor who 20 years ago would've been shot, who 40 years ago they would've done it within the first hour, and who now might not, maybe nothing's going to happen. Don't forget, with Bergdahl we lost at least five people and I watched the parents on television, I've seen the parents, I've met one of the parents, who're devastated, ruined, destroyed. And they were killed going out to try and bring him back, and they lost five people, probably six, by the way. But at least five people.[6] And we knew that he was a traitor because we had a Colonel and a General go and do the interviews before we made the deal. And everybody in the platoon, everybody was saying he walked off, he's a traitor. They said he's a whack job but we made this deal knowing. Now I would've said 'Oh really? He's a

---

[5] The government in turn provided the entire length of the speeches to place the inflammatory comments in context. The twenty-eight minute video was distilled from forty-six hours of speeches.

[6] It is not clear to whom the President referred. *See* Footnote 3.

traitor?  Pass!  Let 'em have him, he's done.'  Frankly,
frankly, I would take that son of a bitch, I'd fly him back,
I'd drop him right over the top, I'm telling you.  I'm
telling you.

On 24 February 2017, the military judge issued a ruling containing detailed findings of fact and conclusions of law.[7]  In his written ruling, the military judge concluded that the multitude of comments were "troubling. . . . [T]hey were clearly made to enflame the passions of the voting populace against his political opponent and in Mr. Trump's favor."  The military judge found that though the comments were "disturbing and disappointing" they did "not rise to the level of 'some evidence' required for the defense to meet its initial burden.  Apparent UCI must still be UCI and the statements of a private citizen, even if running for President, cannot be unlawful command or influence."

On 16 October 2017, appellant pleaded guilty by exceptions and substitutions to desertion and pleaded guilty to misbehavior before the enemy.  After a thorough providency inquiry, the military judge found appellant's plea knowing and voluntary and found him guilty.  The sentencing hearing was scheduled for the following week.  At a press conference, also on 16 October 2017, the Commander-in-Chief, President Trump, stated:  "Well, I can't comment on Bowe Bergdahl because he's -- as you know, they're -- I guess he's doing something today, as we know.  And he's also -- they're setting up sentencing, so I'm not going to comment on him.  But I think people have heard my comments in the past."

On 17 October 2017, the defense made a third motion to dismiss for apparent UCI based on this comment by President Trump.  On 19 October, the convening authority signed an affidavit stating any decision he had taken to date in appellant's case, as well as any future decisions, would not be impacted by an outside influence.  The following day, the Staff Judge Advocate (SJA) signed an affidavit also affirming her understanding of her obligations under the UCMJ.  Also on 20 October 2017, the White House Office of the Press Secretary for President Trump issued a "Statement Regarding Military Justice."[8]  The military judge heard argument on the issue on 23 October 2017.

---

[7] The military judge's ruling addressed appellant's UCI motion in three ways: as actual UCI, as apparent UCI, and as unfair pre-trial publicity.

[8] The statement appeared to be an adaptation of a 2013 Statement by the Secretary of Defense Chuck Hagel.  That statement was a "cleansing statement" to address comments made by President Obama on punishments for sexual assault cases.

This time the military judge concluded that the defense met its burden to provide "some evidence" that UCI existed. The military judge further concluded that the government failed to prove beyond a reasonable doubt that the facts proffered by defense did not exist or did not constitute UCI. However, the military judge found that the government met its burden to prove beyond a reasonable doubt that the UCI would not be an intolerable strain on the public's perception of the military justice system.[9] The military judge stated that he would consider the President's comments as mitigation evidence on sentencing.

As part of appellant's sentencing argument, he specifically requested the judge sentence him to a dishonorable discharge. Prior to requesting the dishonorable discharge, the military judge discussed this request and the consequences thereof at length with counsel and with appellant. Appellant made clear to the court that he believed the appropriate punishment was a dishonorable discharge.

The military judge announced the sentence on 3 November 2017. Immediately following the announcement of the sentence, President Trump posted a statement on the social networking service Twitter that, "the decision on Sergeant Bergdahl is a complete and total disgrace to our Country and to our Military." The defense included the tweet as part of their matters submitted under Rule for Courts-Martial (R.C.M.) 1105. The only relief requested in the R.C.M. 1105 submission was that the SJA and convening authority recuse themselves and send the matter to another convening authority for action. The convening authority took action on appellant's case on 23 May 2018, and approved the findings and sentence as adjudged.

On 26 April 2019, President Trump posted on Twitter, "No money was paid to North Korea for Otto Warmbier, not two Million Dollars, not anything else. This is not the Obama Administration that paid 1.8 Billion Dollars for four hostages, or gave five terroist [sic] hostages plus, who soon went back to battle, for traitor Sgt. Bergdahl!"

---

[9] The military judge made several findings of fact regarding the appellant's election to be tried by military judge alone. The military judge explained, "Under the UCMJ, that means that I am the decider of law, finder of fact and sentencing authority in this case. I have been on active duty for over 29 years. My mandatory retirement date is 1 November 2018. I have been a military judge for nearly 13 years. I was promoted to Colonel in April 2007. I have no hope of or ambition for promotion beyond my current rank. My only motivation as a military judge is and always has been to be fair and impartial and to do justice in every case. I am completely unaffected by any opinions President Trump may have about SGT Bergdahl."

**LAW AND DISCUSSION**

First, we will discuss appellant's claims of unlawful influence. Second, we will address appellant's assertion that Charge II and its specification fail to state the offense of misbehavior before the enemy.

*A. Unlawful Command Influence*

Appellant claims the military judge erred by failing to find and remedy apparent UCI. While we review allegations of UCI de novo, we review the military judge's findings of fact made in ruling on a UCI motion under a clearly erroneous standard. *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999). Where a "military judge made detailed findings of fact . . . and these findings are clearly supported by the record," we adopt them in our analysis. *Id.* Here the military judge's written rulings on each of the defense motions to dismiss based on UCI were well documented and supported by the evidence; therefore we adopt them for our analysis.

Article 37(a), UCMJ, states in relevant part: "No person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ." "Actual unlawful influence occurs when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018) (internal quotation marks and citation omitted).

Even where there was no actual UCI, there may be an appearance of UCI. *See United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006); *United States v. Stoneman*, 57 M.J. 35, 42-43 (C.A.A.F. 2002). In analyzing a case with allegations of apparent UCI, the burden is initially on appellant to show some evidence of UCI, or "more than mere allegation or speculation." *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (citation omitted). The government then bears the burden of proving beyond a reasonable doubt that the facts proffered by appellant do not exist or that the facts do not amount to UCI. *Id.* If the government cannot meet this burden then it must prove beyond a reasonable doubt that the influence of command did not place "an intolerable strain upon the public's perception of the military justice system because an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.* (citation and internal quotation marks omitted); *see also United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013); *Lewis*, 63 M.J. at 415. This is an objective test. *Stoneman*, 57 M.J. at 42.

Appellant raised this issue three times during trial and again during the post-trial process: (1) Senator McCain's comments pre-trial (First Motion to Dismiss for

7

UCI); (2) President Trump's comments while campaigning (Second Motion to Dismiss for UCI); (3) President Trump's comments as President (Third Motion to Dismiss for UCI); and (4) UCI during the post-trial process. We will look to each in turn as well as consider the cumulative effect of Senator McCain's and the President's comments on appellant's right to a fair trial.

*1. Did the comments made by Senator McCain create the appearance of UCI?*

Appellant alleges the military judge erred in denying the defense motion to dismiss or limit the potential punishment as a remedy for Senator McCain's pre-trial comments regarding appellant, including threatening to convene a SASC hearing if appellant was not punished.[10] Though we do not agree with some of the military judge's analysis, we agree with the military judge's ultimate conclusion, that there was no apparent UCI.

Prior to issuing his ruling, the military judge heard evidence on the issue, including hearing the testimony of GEN Abrams. The military judge made detailed findings of fact, to include that though GEN Abrams was aware of Senator McCain's comments, the comments did not affect him and he did not consider them in his decision to refer the charges. With the exception of the finding of fact regarding the date that Senator McCain became Chairman of the SASC,[11] we find nothing clearly erroneous in the judge's findings of fact and therefore adopt them.

At trial, appellant argued that as a retiree of the Navy, Senator McCain was subject to the UCMJ[12] and therefore the prohibitions in Article 37 apply. The military judge concluded that Article 37 would only apply after the retiree was recalled to duty. We disagree with the military judge as to the plain meaning of Article 37. *See generally*, *United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F.

---

[10] This statement was made in response to a reporter's question while Senator McCain was campaigning on behalf of Senator Lindsey Graham. The statement was made after the results of the Article 32 preliminary hearing and prior to referral.

[11] Though the findings of fact state that Senator McCain was chairman of the SASC in January 2014, it was not until January 2015, when the Republican Party became the majority party in the Senate, that Senator McCain became the Chairman.

[12] Article 2, UCMJ contains a list of "Persons subject to this chapter." Among the various entities listed are, "(4) Retired members of a regular component of the armed forces who are entitled to pay." UCMJ art. 2. The military judge found that Senator McCain retired from the Navy in 1981. The military judge made no finding as to the pay status of Senator McCain.

8

2018) ("Retired members of a regular component of the armed forces who are entitled to pay are subject to the UCMJ and, therefore, trial by court-martial.") (citations and internal quotation marks omitted); *United States v. Miller*, 78 M.J. 835, 838 n. 4 (Army Ct. Crim. App. 2019).

Though we agree that the language "subject to this chapter" was not intended to include a member of Congress, Article 37 does not expressly exclude a member who is also a military retiree. The language in Article 37, "No person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member" is unambiguous. If Congress wishes to exempt the members of Congress, or any other group, from jurisdiction under the UCMJ, it has the power to do just that.

Though we disagree with the military judge as to his conclusions regarding whether Senator McCain was subject to the UCMJ for Article 37 purposes, we agree with his conclusion that there was no evidence of unlawful command influence. The military judge correctly found that the defense failed to meet its burden of establishing "some evidence which, if true, would constitute UCI which would have a logical connection to [the] court-martial in terms of potential to cause unfairness in the proceedings."

The record shows that the convening authority had no communication with Senator McCain or his office, nor did any person in senior Army leadership (either military or civilian) attempt to interfere with GEN Abrams as he made his referral decision. Further, the record contains no evidence that Senator McCain attempted to take any action for or against the convening authority or any member of the court-martial.[13]

Even if one concluded that a Senator's threat to hold a hearing was an attempt to coerce or influence the action of a convening authority, we find it did not rise to the level of an "intolerable strain" on the military justice system. The trial judge found, and we agree, that "[a] reasonable member of the public knowing all the facts and circumstances would recognize Senator McCain's ill-advised statements for just

---

[13] Appellant asserts the fact that the SASC plays an important role in the confirmation of military officers' promotions and positions, and that, in the past, Senator McCain has threatened to hold up confirmations of military officers, is evidence of UCI. We find the link between the role of the SASC and issues that Senator McCain may have had with other Army officials and policies speculative at best. Even assuming *arguendo* that the comment constituted some evidence of UCI, we find the government successfully met its burden and removed any taint with GEN Abrams' testimony.

what they were – political posturing designed to embarrass a political opponent (President Obama) and gain some political advantage."

*2. Did the comments made by candidate Trump create the appearance of UCI?*

Appellant next alleges the military judge erred when he failed to remedy the UCI created by the litany of insulting comments candidate Trump levied against appellant during his presidential campaign. Unlike Senator McCain, who was an honorably retired naval officer, and therefore a "person subject to [the UCMJ]," Mr. Trump never served in the armed forces and does not fit any of the definitions of a "person subject to the code." UCMJ art. 2. Prior to becoming president, Mr. Trump was neither an elected official nor was he a government employee. The question then becomes whether his vilification of appellant as a private citizen created the appearance of UCI at appellant's court-martial.

There is no precedent for finding UCI based on the remarks of private citizens, even influential ones. Appellant argues this court should look to the rationale in *Trump v. Hawaii*, and apply a similar analysis. 138 S. Ct. 2392 (2018). We find that case easily distinguishable. In *Trump v. Hawaii*, the Supreme Court considered candidate Trump's campaign vows to bar Muslims from entering the U.S. as extrinsic evidence of his motive to issue an Executive Order (EO)[14] that placed restrictions on the nationals of predominantly Muslim countries seeking entry into the U.S. *Id.* at 2417-20.

In *Trump v. Hawaii*, the President's EO was the subject of the challenge; meanwhile, his campaign rhetoric was merely a consideration in the Court's analysis of the EO's constitutionality. In appellant's case, by contrast, at the time of appellant's second motion to dismiss for UCI, President Trump had just been inaugurated and had not taken any action *as President* or made any comment regarding appellant. Essentially, appellant's second motion to dismiss was not ripe.

Appellant alleges the military judge erred by not correctly applying the test for apparent UCI, and instead blended his analysis between actual and apparent UCI. We find no error, as we agree with the military judge that appellant did not meet his burden to establish any evidence of UCI – the first step in either an actual or apparent UCI case. Before the burden shifts to the government, to prove either no prejudice to the accused (actual UCI) or no intolerable strain on the public's perception of the military justice system (apparent UCI), the defense must meet its

---

[14] *See* Executive Order No. 13769, Protecting the Nation from Terrorist Entry Into the United States, 82 Fed. Reg. 8977 (2017).

burden. Incendiary remarks by private citizens, even influential ones, do not constitute evidence of UCI.[15]

   3. *Did the comments made by President Trump create the appearance of UCI?*

On 16 October 2017, the military judge accepted appellant's guilty plea. That same day the President was asked about appellant's case. In response, President Trump stated, "Well, I can't comment on Bowe Bergdahl because he's -- as you know, they're -- I guess he's doing something today, as we know. And he's also -- they're setting up sentencing, so I'm not going to comment on him. But I think people have heard my comments in the past." Defense counsel immediately renewed their motion to dismiss for apparent UCI, and contended the President had ratified all of his earlier comments.

The military judge agreed with appellant that this statement was a ratification of the President's campaign rhetoric. He found the "plain meaning of the President's words to any reasonable hearer could be that in spite of knowing that he should not comment on the pending sentencing in this case he wanted to make sure that everyone remembered what he really thinks should happen to the accused." The military judge also found that as the commander-in-chief of all the armed forces, he has the power to fire[16] or take adverse administrative action against any military officer involved in the trial of this case from sentencing forward (i.e. himself, the SJA, the convening authority, and the judges of the Army Court of Criminal Appeals). The military judge therefore found appellant met his initial burden showing some evidence of UCI. The military judge found this a close call.

---

[15] In many cases, the remarks made by private citizens before trial may be relevant during *voir dire* of panel members and in the analysis of the effect of pretrial publicity. In his ruling the military judge analyzed the campaign remarks as both UCI and their impact on pretrial publicity. He correctly applied the law as set out in *Skilling v. United States*, 561 U.S. 358 (2010), *Irwin v. Dowd*, 366 U.S. 717 (1961), and *United States v. Gray*, 51 M.J. 1 (C.A.A.F. 1999); finding it was premature to conclude appellant could not get a fair trial without questioning any member of the venire.

[16] Congress has limited the President's ability to directly fire military officers. *See* 10 U.S.C. § 1161(a). The military judge was correct in finding the President can take adverse action which could ultimately result in a resignation, retirement, or separation. In the case of the convening authority, the President could relieve him of his command which would mean that GEN Abrams would have to retire or revert to his permanent grade of major general. *See* 10 U.S.C. § 601.

Applying the *Boyce* framework, the military judge ultimately concluded that the government met its burden to show no intolerable strain "*and* that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of these proceedings."[17] (emphasis in original).  We agree.

The military judge gave appellant an opportunity to withdraw his plea.  He chose not to.  Therefore, the question we ask is how would an objective, disinterested, fully informed observer, knowing that there is no actual unlawful influence, view the sentencing proceedings when the individual determining the sentence was this particular military judge.[18]

President Trump's words make clear how he felt about appellant.  The actual comments were removed in time from the sentence proceedings.  Although President Trump ratified the comments, their impact was lessened by the remoteness.  Further, the military judge, the SJA, and the convening authority credibly explained that they were not and would not be influenced by the President's statement.  When comparing the facts here to those in *Boyce* and *Barry*, we are struck by differences between cases where individuals reached out to the convening authority and the SJA

---

[17] The military judge explained his conclusion as follows:

> The evidence establishes beyond a reasonable doubt that I am uninfluenced by the President's comments and more importantly, that I hold no fear of any repercussions from anyone if they do not agree with my sentence in this case. As their affidavits make clear, the same is true of GEN Abrams and COL Berry [the SJA] with respect to their respective post-trial duties in this case.  If that were not enough, the statement by the President through his press secretary makes clear that he does not expect any certain sentence in this case and that he does expect me and everyone else involved in this case in any way to use our own discretion and judgment and do what we think is right under the law. All judges, including those at the Army Court of Criminal Appeals, are expected and presumed to know and properly apply the law.

[18] The military judge offered to require all future persons involved in the review of appellant's case, including the convening authority and the judges on the Army Court of Criminal Appeals, to read the memorandum from the White House on Military Justice.  The defense demurred.

instead of a case like appellant's, where the comments were brought to the attention of the court by the defense itself.

We conclude that under the facts in this case, the military judge was correct in finding there was not an intolerable strain on the public's perception of the military justice system because a fully informed observer would not harbor a significant doubt as to the fairness of the proceedings.[19]

### 4. Unlawful Command Influence and the Post-trial Process

The same day appellant's sentence was announced, President Trump publicly expressed his displeasure with the sentence in a post on Twitter: "the decision on Sergeant Bergdahl is a complete and total disgrace to our Country and to our Military." During the seven months from the end of appellant's court-martial until the convening authority's action, the President made no further comments regarding appellant. The defense included the tweet in its R.C.M. 1105 submissions.[20]

The convening authority received the post-trial record, including appellant's R.C.M. 1105 submissions, and the recommendations of the SJA. On 23 May 2018, after considering all of appellant's matters, including appellant's specific request for a dishonorable discharge, the convening authority approved the sentence as adjudged.

Unlawful influence can impact any phase of a trial to include the convening authority's actions and the appellate court. *See, e.g., Barry*, 78 M.J. 70 (finding the Navy Deputy Judge Advocate General committed UCI while advising convening authority during post-trial processing). Unlike appellant's allegations of UCI litigated at trial, the allegations of UCI in the post-trial phase were raised for the first time on appeal. As there are no facts in contention, we are able to analyze the allegation on the record before us.

---

[19] The government appears to argue the military judge's statement that he would consider the President's statements as mitigation evidence, while deliberating on an appropriate sentence, was an appropriate remedy for UCI. If we agreed with the government that the military judge found apparent UCI, and then as a remedy considered the statements as mitigation, we would find that the military judge did not properly cure the taint of UCI from the trial. As the government misunderstood the military judge's ruling, this is not an issue.

[20] The only relief defense requested was for the convening authority and SJA to recuse themselves from the post-trial process.

Appellant argues the President's post on Twitter constitutes UCI because it violated R.C.M. 104(a)(1). Appellee contends the President's tweet does not constitute UCI because the President can only violate R.C.M. 104(a)(1) if he personally convened the court-martial.

Rule for Courts-Martial 104(a)(1) mirrors Article 37, UCMJ, in most respects. There is a difference which is relevant in this case. Article 37 states "No authority *convening* a [general court-martial] may censure, reprimand, or admonish *the* court or any member, [or] military judge . . . with respect to the findings or sentence adjudged by the court." (emphasis added). Rule for Courts-Martial 104(a)(1) states "No *convening authority*…may censure, reprimand, or admonish *a* court-martial. . . or any member, military judge or counsel thereof with respect to the findings or sentence adjudged by the court-martial. . . ." (emphasis added).

A plain reading of Article 37 leads to the conclusion that Congress has prohibited a convening authority from censuring the military judge for a sentence in a case that he convened. The text of R.C.M. 104(a)(1) expands this to include the prohibition of a convening authority censuring a military judge for a sentence regardless of who convened the trial.

Here we have the President, who is listed as a convening authority under Article 22, UCMJ, censuring the military judge for appellant's adjudged sentence. The President did not convene this court-martial; therefore his tweet did not violate Article 37, but did violate RCM 104(a)(1).[21]

Having found that the President's day-of-sentencing tweet violates R.C.M. 104(a)(1), but not Article 37, the question arises of whether, and how, to apply the CAAF's Article 37 UCI jurisprudence to this situation. While neither the CAAF nor this court has addressed this issue head-on, at least two independent lines of logic support the conclusion that we should apply the CAAF's Article 37, UCMJ, UCI jurisprudence here.

First, while the precise inclusion/exclusion lines differ slightly, there is no question that the underlying intent behind both R.C.M. 104(a)(1) and Article 37 is

---

[21] In coming to this conclusion we considered the fact that the Rules for Courts-Martial are promulgated by the President. *See* UCMJ art. 36. We specified the question of whether the President is bound by his own rules. We conclude that though the President can change the rules without a notice and comment period, he would have to affirmatively make the change either through executive order or statement of policy and not impliedly after violating one of the rules. *See* 5 U.S.C. § 553(a)(1) (exempting rule making procedures from "a military or foreign affairs function of the United States").

the same. That is to say, both seek to insulate courts-martial from inappropriate outside influence by commanders and leaders, both military and civilian.

Since the dawn of the UCMJ era in *United States v. Doherty*, 5 U.S.C.M.A. 287, 17 C.M.R. 287 (1954), and in *United States v. Estrada*, 7 U.S.C.M.A. 635, 23 C.M.R. 99 (1957), the CAAF has applied UCI jurisprudence to situations involving senior civilian leaders where those leaders did not fall into the black-letter coverage of *either* Article 37 *or* R.C.M. 104(a)(1).

Less than five years after the passage of the UCMJ, the CAAF's predecessor court held in *Doherty* that a policy memorandum from the Secretary of the Navy, interpreted by the convening authority to restrict his clemency authority, "conflict[ed] with the [UCMJ] and must yield." 17 C.M.R. at 296. While the CMA did not believe the Navy Secretary's policy memorandum in fact mandated separation, the court was "convinced the convening authority did" so believe, and thus remanded the case for a new convening authority's action. *Id.*; *see also Estrada*, 23 C.M.R. at 102 (C.M.A. 1957) (addressing use of another Secretary of the Navy instruction at a court-martial, noting "although we are here faced with a Secretary rather than a command directive, the former, emanating from the Secretary of a service, *would be even more persuasive* and bring more pressure to bear upon the members of the court than the latter type directive," and further explaining that "[i]t was against this sort of command influence that the Code was initially directed.") (emphasis added); *United States v. Allen*, 20 U.S.C.M.A. 317, 43 C.M.R. 157, 158 (1971) (setting aside a sentence in the face of yet another Secretary of the Navy instruction that seemingly mandated a discharge and which was read to the court-martial panel, and explaining "no cautionary instruction to members of the court that they may disregard the announced policies of their commander can relieve the error from prejudice.").

Recently in *Boyce*, 76 M.J. 242, the CAAF applied its apparent UCI jurisprudence to the actions of the Secretary of the Air Force, in a case which involved, not the question of whether the Secretary was a "convening authority," but whether she was "subject to the UCMJ," because of the applicable portion of Article 37 at issue in that case. *Boyce*, 76 M.J. at 246, n.3.[22]

In light of the foregoing, we conclude the CAAF's apparent UCI jurisprudence for Article 37 violations is the appropriate lens through which to analyze the President's R.C.M. 104(a)(1) violation.

---

[22] The CAAF noted that the "Secretary of the Air Force is not . . . subject to the UCMJ," but accepted the government's "unequivocal[] conce[ssion]" that the CAAF's apparent UCI jurisprudence applied to its resolution of the case. *Boyce*, 76 M.J. at 246 n.3.

### a. Convening Authority's Action

Applying the *Boyce* framework we find appellant has established some evidence of UCI, and the government has not refuted those facts. Therefore, we must determine if the government has met its burden beyond a reasonable doubt that any apparent UCI was ameliorated and the disinterested public would believe appellant received a convening authority action free from the effects of UCI.

Does the day-of-sentencing tweet constitute an intolerable strain on the military justice system? Would a fully informed observer knowing all of the facts and circumstances harbor a significant doubt as to the fairness of the convening authority's action?

We look at the entire record to answer these questions. The only change between the military judge's announcement of the sentence and the convening authority's action was the one tweet by the President and the addition of appellant's matters under R.C.M. 1105. We find that after appellant's trial, appellant went on regular leave, which converted into appellate leave. We find that seven months passed between the end of appellant's trial and the convening authority's action. We find no evidence in the record that any party subject to the UCMJ attempted to influence the convening authority. Nor do we find evidence of unintentional influence.[23]

The convening authority testified credibly and produced two affidavits, including one which recognized that there might be future attempts to influence him.[24] The sentence he was taking action on consisted of a dishonorable discharge, forfeiture of $1,000 pay per month for ten months, and a reduction to the grade of E-1. The convening authority had the record of trial, including all of the evidence in aggravation and the evidence in mitigation, and the fact that appellant pleaded guilty and specifically requested a dishonorable discharge. Appellant's post-trial matters submitted to the convening authority, under R.C.M. 1105 and R.C.M. 1106,

---

[23] When analyzing this tweet, we note the censure is of the military judge. This is not to minimize the violation of R.C.M. 104(a)(1), but to recognize that the impact on the convening authority would be different. A tweet directed at the convening authority or exhorting action (e.g., "Will no one rid me of this meddlesome priest?") would lead to a different conclusion.

[24] General Abrams swore: "all decisions already made by me and any future ones as the GCMCA are within my own discretion based only on the law and materials properly submitted to me for my review. I will continue to vigilantly guard my independent decision making as the GCMCA as required under the Uniform Code of Military Justice. My decisions will not be impacted by any outside influence."

consisted of a single request to have the matter considered by a different convening authority and is absent of any formal request for clemency in the form of sentence reduction.

Applying the test from *Boyce* to the facts in this case, we believe a fully informed observer would not have a significant doubt as to the fairness of the proceeding. "We focus upon the perception of fairness in the military justice system as viewed by a member of the public." *Lewis*, 63 M.J. at 415. In spite of the tweet by the President, we do not believe that an informed member of the public would harbor any doubt, let alone a significant doubt, that appellant received a fair trial to include his chance at clemency.[25]

We also look to the strain on the military justice system. We find some strain – we are mindful that the President's words could have a chilling effect on this military judge or on similarly situated appellants. We are convinced the military justice system is not so fragile that this comment caused an intolerable strain.

*b. Appellate Review*

In addition to the issue of whether the President's tweet created unrebutted UCI in the action by the convening authority, appellant contends that this court is tainted by UCI and unable to conduct our appellate review. We have considered appellant's argument and applying the standards set out in R.C.M. 902 and the Code of Conduct for United States Judges; we disagree.

We next address appellant's supplemental allegation of error, that during the pendency of his appeal President Trump committed additional UCI by again publicly vilifying appellant as a traitor. We conclude that this tweet does not amount to UCI: "No money was paid to North Korea for Otto Warmbier, not two Million Dollars, not anything else. This is not the Obama Administration that paid 1.8 Billion Dollars for four hostages, or gave five terroist [sic] hostages plus, who soon went back to battle, for traitor Sgt. Bergdahl!!"

Unlike the President's comment on the adjudged sentence, the tweet is not a per se violation of R.C.M. 104(a)(1). While parts of the tweet are inaccurate,[26] there

---

[25] The injured party in this case is the military judge, not appellant. We do not believe the President's feeling that appellant received too light a sentence should drive us to then give appellant a windfall of setting aside the sentence he asked for and received. That would be illogical and not enhance public perception of the military justice system.

[26] The United States military does not take hostages. The record shows that the

(continued . . .)

17

is no nexus between the tweet and the appellate process. This court would have no knowledge of the President's statement but for the submission by appellant. Applying the *Boyce* test we do not believe that this tweet meets appellant's threshold burden of some evidence of UCI.[27]

### 5. *Cumulative UCI*

The military judge properly analyzed the allegations of UCI as they were raised by appellant. In this opinion we too have analyzed each allegation of UCI in a discrete fashion. We also ask the question: is there a cumulative effect which, as in a cumulative error case, that denied appellant of a fair trial. *See United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2010).

In a standard cumulative error case we review de novo the effect of all plain errors and preserved errors. *Id.* Under the cumulative-error doctrine, "a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding." *United States v. Banks*, 36 M.J. 150, 170-71 (C.M.A. 1992) (citation and quotation marks omitted). We only review actual errors, not just allegations. *United States v. Hammer*, 60 M.J. 810, 819 (citing *United States v. Gauvin*, 173 F.3d 798, 804 (10th Cir. 1999)). If after reviewing the errors we find the cumulative errors denied appellant a fair trial, then we must reverse. *See Pope*, 69 M.J. at 335.

Applying the logic of the cumulative error doctrine to allegations of UCI, we look to all of the allegations of UCI which met the standard of "some evidence of UCI", that is the pre-sentencing comment of President Trump which validated his prior comments regarding appellant, and his tweet censuring the military judge. We find the cumulative effect could not reasonably be perceived by a disinterested

---

(. . . continued)
individuals exchanged for appellant were members of a designated enemy force—the Taliban—which were lawful targets. When these lawful targets came into the custody of the Armed Forces of the United States, they became military detainees— not "hostages."

[27] We review appellant's sentence for appropriateness pursuant to our Article 66 authority. We consider only the crimes for which appellant was found guilty. Appellant pleaded guilty and was convicted of desertion to shirk hazardous duty and misbehavior before the enemy. He was neither charged with nor convicted of being a traitor. As with the President's earlier statements declaring that the individuals released returned to the battlefield, there is no evidence in the record supporting this assertion.

member of the public as improper command influence or otherwise indicative of an unfair proceeding.

### B. Misbehavior before the Enemy

Appellant argues Charge II and its specification, alleging appellant committed misbehavior before the enemy, fails to state an offense. Appellant preserved this issue by timely objection and a conditional plea at his court-martial. We review whether a specification states an offense de novo. *United States v. Schloff*, 74 M.J. 312, 313 (C.A.A.F. 2015).[28]

To state an offense, a specification must allege every element of the offense "either expressly or by necessary implication, so as to give the accused notice and protect him against double jeopardy." *United States v. Dear*, 40 M.J. 196, 197 (C.M.A. 1994) (citations omitted). "This is a three-prong test requiring (1) the essential elements of the offense, (2) notice of the charge, and (3) protection against double jeopardy." *Id.*

In relevant part, Article 99 provides:

> Any member of the armed forces who before or in the presence of the enemy—
> . . .
> (2) shamefully abandons, surrenders, or delivers up any command, unit, place, or military property which it was his duty to defend;
> (3) through disobedience, neglect, or intentional misconduct endangers the safety of any such command, unit, place, or military property;
> . . . shall be punished by death or such other punishment as a court-martial may direct.

In relevant part, Charge II and its specification alleged:

---

[28] Appellant intertwines his argument alleging Charge II and its specification failed to state an offense with an argument that he was improvident when he pleaded guilty to that charge and specification. Under appellant's theory, the military judge abused his discretion by accepting appellant's guilty plea because he did not define "intentional misconduct" as meaning independently criminal conduct when he explained the elements of the offense to appellant prior to accepting appellant's plea. For much the same reasons we conclude the military judge did not err when he denied appellant's motion to dismiss Charge II and its specification for failure to state an offense, we also conclude the military judge did not abuse his discretion when he accepted appellant's plea of guilty to that charge and specification.

> [Appellant did,] before the enemy, endanger the safety of Observation Post Mest and Task Force Yukon, which it was his duty to defend, by intentional misconduct in that he left Observation Post Mest alone; and left without authority; and wrongfully caused search and recovery operations.

Thus, appellant was charged under subsection three of Article 99, specifically under the theory that he committed intentional misconduct that endangered OP Mest and Task Force (TF) Yukon. As a result, appellant was charged with an offense consisting of the following elements: (1) appellant had a duty to defend OP Mest and TF Yukon; (2) appellant committed intentional misconduct by leaving OP Mest alone and without authority, and wrongfully caused search and recovery operations; (3) appellant thereby endangered the safety of OP Mest and TF Yukon; and (4) appellant did so before the enemy.

Appellant admitted the factual predicate of the charges, but challenges whether leaving OP Mest alone, without authority, and wrongfully causing search and recovery operations constituted "intentional misconduct." Appellant's challenge has three components: First, appellant argues "intentional misconduct" is synonymous with independently criminal conduct. Second, appellant asserts that because intentional misconduct is synonymous with independently criminal conduct, a charge alleging intentional misconduct must allege the elements of a separate offense under the UCMJ. Third, appellant contends that because the intentional misconduct alleged in Charge II and its specification includes three clauses, each separated by a semicolon, each clause must independently allege all the elements of a separate offense under the UCMJ. We disagree. We address each of appellant's arguments in-turn.

### 1. Intentional Misconduct and Independently Criminal Conduct

Appellant's argument is predicated largely on *United States v. Carey*, 4 U.S.C.M.A. 112, 15 C.M.R. 112 (1954). In *Carey*, our superior court affirmed Corporal (CPL) Carey's conviction alleging he ". . . did, at APO 248, on or about 3 December 1952, before the enemy, endanger the safety of his unit, Tank Company, 9th Infantry Regiment, which it was his duty to defend, by intentional misconduct in that he became drunk while on duty as Tank Commander." *Id.* at 114.

On appeal, CPL Carey raised a claim much like appellant's, alleging that "intoxication alone does not constitute the offense of misbehavior." *Id.* To evaluate CPL Carey's claim, our superior court considered that the term misconduct "contemplates a transgression of some established and definite rule of action, where no discretion is left, except what necessity may demand; . . . a violation of a definite law." *Id.* at 115 (internal citations and quotation marks omitted).

Our superior court affirmed CPL Carey's conviction and explained "there is no doubt" that drunkenness "constitutes intentional misconduct . . . for drunkenness is a violation of Article 134 of the Code, and, when it occurs while on duty, it is a violation of Article 112 of the Code." *Id.* at 116 (internal citations omitted).

Appellant further relies on *United States v. Miller*, 44 C.M.R. 849 (A.C.M.R. 1971). In *Miller*, our predecessor court found Private (PVT) Miller and Specialist (SPC) Vinson's convictions for misbehavior before the enemy factually insufficient. Private Miller and SPC Vinson were charged under the theory they committed intentional misconduct when they "played dead during a sapper attack" on the fuel tank farm they were guarding in Vietnam. Overturning the two soldier's convictions, our predecessor court relied on the specific facts and circumstances of the case.

Our predecessor court found the evidence against PVT Miller and SPC Vinson was simply too flimsy to support convictions for misbehavior. The court noted that "there is not a scintilla of evidence to show that they violated any specific orders or instructions by remaining in the gate shack during the brief but violent enemy attack." *Id.* at 853. The court further observed: "'Playing dead' is not much different from 'taking cover;' neither is misconduct, per se. Suffice it to say that we are not convinced beyond a reasonable doubt that the behavior of the accused, under the attendant circumstances, constituted intentional misconduct within the meaning of Article 99 . . . ." *Id.*

Appellant argues his case is like *Miller*, and unlike *Carey*. We disagree. *Miller* was a fact-specific opinion based on insufficiency of the evidence. The facts of appellant's case are simply nothing like the facts in *Miller*. By contrast, appellant's case has many parallels with *Carey*.

Much like the intentional misconduct at issue in *Carey*, the intentional misconduct with which appellant was charged—leaving OP Mest without authority—is a violation of Article 86, in that appellant absented himself from his unit and place of duty without authority. In fact, Article 86—absence without leave—is a lesser-included offense of Article 85—desertion—to which appellant pleaded guilty immediately before pleading guilty to misbehavior before the enemy.

We are skeptical of appellant's argument that "intentional misconduct" is synonymous with independent criminal conduct. In *Carey*, our superior court indicated that because CPL Carey's intentional misconduct violated a separate article of the UCMJ, there was no fair dispute that it constituted intentional misconduct under Article 99. This is not the same as holding that an act *must* be independently criminal to constitute intentional misconduct. Nevertheless, we need not decide this issue in order to decide appellant's case. The intentional misconduct alleged against appellant was indeed independently criminal. Thus, as alleged,

Charge II and its specification states the essential elements of misbehavior before the enemy, placed appellant on adequate notice of the theory under which he was charged, and provided sufficient specificity to protect appellant from double jeopardy. [29]

*2. Elements within Elements*

Even assuming, *arguendo*, that intentional misconduct is synonymous with independent criminal conduct, appellant's claim that a specification alleging intentional misconduct must explicitly allege every element of the independent criminal conduct is incorrect.

Several punitive articles under the UCMJ incorporate predicate crimes: *e.g.* Article 78 (accessory after the fact); Article 81 (conspiracy); and Article 134 (misprision and soliciting). Specifications alleging any of these derivative offenses need not allege all the elements of the predicate crime to state an offense. This principle is consistent with the rule that a specification must allege every element of the charged offense "either expressly *or by necessary implication*." *Dear*, 40 M.J. at 197 (emphasis added).

For example, a specification alleging conspiracy to commit larceny need not explicitly allege the elements of larceny. *United States v. Norwood*, 71 M.J. 204, 206 (C.A.A.F. 2012). If an accused requires additional specificity with respect to the nature of the alleged larceny, the accused may request a bill of particulars.

We see no reason to establish a different rule for misbehavior before the enemy than for conspiracy or other offenses that allege a predicate crime. Even if intentional misconduct were synonymous with independent criminal conduct, a specification alleging intentional misconduct need not explicitly state every element of a separate crime in order to state an offense.

Appellant plainly had notice of the theory of intentional misconduct alleged in Charge II and its specification. The nature of the specification was heavily litigated long before appellant's guilty plea. Moreover, during appellant's plea inquiry, he was fully provident to the nature of his intentional misconduct. Thus, any argument

---

[29] During appellant's providence inquiry, the military judge asked appellant if he had any questions about any element of the offense or the definition of any term the military judge used. Appellant replied in the negative. Appellant further agreed that his actions in leaving OP Mest without authority constituted intentional misconduct. We therefore reject appellant's claim on appeal that the military judge abused his discretion by accepting appellant's plea of guilty.

that appellant lacked sufficient notice as to the elements of the offense to which he pleaded guilty is meritless.

*3. Semicolons separate grammatically complete clauses;*
*they also indicate a close relationship between clauses.*

Appellant argues that, because the government elected to use semicolons to separate three clauses describing appellant's intentional misconduct, each clause separated by a semicolon must allege independently criminal conduct in and of itself. Appellant's argument is based on the fact that semicolons are properly used to separate "independent" clauses within a single sentence. We are unpersuaded by appellant's argument.

Semicolons are used to suggest a close relationship between *grammatically* independent clauses that are nevertheless *conceptually* related. *See* William Strunk Jr, & E. B. White, *The Elements of Style* 5-6 (4th. ed. 2000). In such use, clauses separated by a semicolon are grammatically independent, but conceptually linked.

The content of the clauses at issue further shows they are conceptually linked. The first clause states, "[appellant] left [OP] Mest alone." While that clause could stand on its own, it is followed by a clause that reads, "and left without authority." The second clause lacks both a subject and an object unless both are implied by the preceding clause: *Who* left *what* without authority? *Appellant* left *OP Mest* without authority.

The third clause contains a compound object, "search and recovery operations" but lacks a subject unless the subject is implied by the first clause. *Who* wrongfully caused search and recovery operations? *Appellant* wrongfully caused search and recovery operations. In context, the third clause also implies a prepositional phrase. *How did* appellant wrongfully cause search and recovery operations? Appellant wrongfully caused search and recovery operations *by leaving OP Mest alone and without authority*.

Artless punctuation did not nullify the plain meaning of the sentence at issue.[30] The meaning of the sentence comprising Charge II and its specification is

---

[30] While the military judge focused on the use of semicolons to separate items in lists that contain internal commas, we note that there are several other proper uses for semicolons. *See, e.g.,* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 357-60 (2016). Nevertheless, we agree with the military judge that the use of semicolons in Charge II and its specification was artless, and perhaps

(continued . . .)

that appellant committed a single unit of prosecution—"intentional misconduct"— and all three clauses following the words "in that" comprise the unit of prosecution with which appellant was charged. *See generally United States v. Retz*, 777 F.3d 1105 (10th Cir. 2015) (discussing the importance of identifying the unit of prosecution in criminal statutes).

If the government intended to allege three separate instances of intentional misconduct—each an independent unit of prosecution—under a single specification, it would have alleged appellant did so on "divers occasions." The government did not. Taken as a whole, the theory of liability alleged was unambiguous.[31]

Even if we agreed with appellant that intentional misconduct is synonymous with independently criminal conduct; that the government must allege all the elements of an independent crime in order to properly charge "intentional misconduct;" and that separating clauses with semicolons makes the clauses conceptually and not just grammatically independent; we would still find the military judge did not abuse his discretion by denying appellant's motion to dismiss Charge II and its specification.

Under the reading most solicitous to appellant, Charge II and its specification alleged appellant, who had a duty to defend OP Mest, instead left OP Mest without authority. Article 86 criminalizes going from a place of duty without authority. While the language of Charge II and its specification may be cumbersome, we find it includes all the elements necessary to allege an offense under Article 86 either explicitly or by necessary implication. Thus, Charge II and its specification still

---

(. . . continued)

improper. Semicolons may be used in "old-fashioned style" to set off a dependent clause or phrase by way of elaboration or explanation. *Id.* at 358. In modern use, however, the semicolon was replaced in this role by the dash and the comma. *Id.*

[31] To the extent appellant has also challenged the providence of his guilty plea, we find the nature of the charged intentional misconduct was more than adequately explained to appellant long before he entered his plea. In the ruling denying appellant's motion to dismiss Charge II and its specification, the military judge noted that it was grammatically artless to use semicolons to separate the three clauses at issue. Nevertheless, he found the meaning of the specification was clear. The military judge explained the three clauses were alleged conjunctively, as indicated by use of the word "and" between the clauses. He further explained: "These are dependent clauses that mean: The accused left OP Mest alone and without authority and, thereby, wrongfully caused search and recovery operations." By the time appellant pleaded guilty to Charge II and its specification, he plainly understood the charged theory of liability, to which he admitted guilt.

would state an offense even if we accepted all of appellant's other arguments about intentional misconduct.

For the foregoing reasons, we conclude the military judge did not err when he denied appellant's motion to dismiss Charge II and its specification for failure to state an offense. We further find the military judge did not abuse his discretion when he accepted appellant's guilty plea to misbehavior before the enemy.

## CONCLUSION

We conclude that under the facts in this case that the military judge was correct in finding that there was neither an intolerable strain on the public's perception of the military justice system nor would a fully informed observer harbor a significant doubt as to the proceedings.

The findings of guilty and the sentence are AFFIRMED.

Judge SALADINO concurs.

Judge EWING, concurring in part and dissenting in part:

As the majority correctly holds, R.C.M. 104 applies to the President, and the President's day-of-sentencing tweet violated R.C.M. 104(a)(1), and thus raised some evidence of UCI.[32] I further agree with the majority that these findings shift the burden onto the government to show, beyond a reasonable doubt, that the convening authority's action was not tainted by either actual or apparent UCI. Where I part ways with the majority is that I do not believe the government has met this high

---

[32] The government has contended that the President's actions should be viewed through the "rubric of Due Process," rather than through the traditional application of the CAAF's UCI jurisprudence. While I disagree for the reasons stated by the majority and find that R.C.M. 104 applies to the President's actions here, I further note that even where the CAAF has considered similar arguments about civilian authorities influencing courts-martial, it has ultimately applied its traditional UCI tests. *See, e.g., Boyce*, 76 M.J. at 246 n.3 (applying UCI jurisprudence to actions by the Secretary of the Air Force); *United States v. Hutchins*, 72 M.J. 294, 312-13 (2013) (Baker, C.J., dissenting) (applying Article 37 jurisprudence "through a due process lens" to actions by the Secretary of the Navy). This may ultimately be a distinction without a difference, as the CAAF's UCI jurisprudence is rooted in the Due Process Clause. *See Thomas*, 22 M.J. at 393, 396-97 (citing to *Chapman v. California*, 386 U.S. 18 (1967) for requirement that government must disprove UCI beyond a reasonable doubt); *Boyce*, 76 M.J. at 249 n.8 (discussing beyond a reasonable doubt standard and interplay with due process).

burden here. Therefore, while I concur with the rest of the majority opinion, I respectfully dissent from the majority's holding that appellant received a convening authority's action free from UCI.

The singular challenge in military justice is the empowerment of the system's critical decision-makers – panel members, military judges, and convening authorities – to exercise their independent judgment in adjudicating courts-martial, without regard to external influence. Outside of the military justice system, *the law requires* these same individuals to follow all lawful orders of their superiors. *See, e.g.,* Article 90, UCMJ (criminalizing willful disobedience of a superior commissioned officer); Article 91, UCMJ (criminalizing insubordinate conduct towards noncommissioned officers). Indeed, the military's enlistment oath expressly names the President of the United States, by position, as new recruits "solemnly swear" to obey, 10 U.S.C. § 502. Likewise, Article 88, UCMJ makes it a crime for a commissioned officer to "use contemptuous words against the President" in certain circumstances. These laws reflect the bedrock principle of civilian control of the military by a duly-elected President, and the President's civilian Defense and Service Secretaries. For good reason, this is how the military functions on a day-to-day basis, in both garrison and combat.

By contrast, for the *military justice system* to function, its uniformed decision-makers must exercise true independence. The system would crumble if Service Secretaries could order convening authorities to refer cases to courts-martial, or commanders could order panel members to vote for particular sentences. *See, e.g., Boyce*, 76 M.J. at 252-53 (reversing a conviction based on apparent UCI on a convening authority's referral decision); *United States v. Chikaka*, 76 M.J. 310, 313 (C.A.A.F. 2017) ("the use of 'a commanding officer before a court-martial . . . to influence the court members into returning a particular sentence' implicates unlawful command influence.") (quoting *United States v. Ohrt*, 28 M.J. 301, 303 (C.M.A. 1989)). This risk is exacerbated when the UCI comes from the top. *See Estrada*, 23 C.M.R. at 101 (directive from the Secretary of the Navy "would be even more persuasive and bring more pressure to bear upon the members of the court" than one from a uniformed commanding officer, because "[r]easonable men must conclude that once the Secretary of a service enters into the restricted arena of the courtroom, whether the members of the court are conscious thereof or not, he is bound to exert some influence over them"). The dichotomy between how the military works day-to-day and how the military justice system must function in order to produce justice is why, for good reason, the CAAF has repeatedly called UCI the "mortal enemy of military justice." *See, e.g., Boyce*, 76 M.J. at 246 (citing *Thomas*,

22 M.J. at 393); *Barry*, 78 M.J. at 76; *United States v. Riesbeck*, 77 M.J. 154, 166 (C.A.A.F. 2018); *United States v. Douglas*, 68 M.J. 349, 355 (C.A.A.F. 2010).[33]

It is against this backdrop that the President issued his day-of-sentencing tweet. The tweet labeled appellant's adjudged sentence "a complete and total disgrace" to both the "Country" and "Military" (sic).[34] The tweet was timely, highly specific, addressed appellant's case by name, and was an unequivocal rebuke of the military judge's in-court sentencing decision, which the UCMJ empowered the judge to make. *See* UCMJ art. 53. Moreover, the President's prior statements about appellant left no doubt that, in the President's opinion, the "disgrace" of appellant's sentence was that it was disgracefully light.

The convening authority was aware of the President's day-of-sentencing tweet, if for no other reason than appellant provided it to him in his post-trial matters pursuant to R.C.M. 1105 and 1106.[35] The inescapable logic of the President's tweet was that the President would take a similarly dim view, or worse, of, for example, the convening authority's setting aside appellant's adjudged Dishonorable Discharge at action. Thus, the convening authority knew precisely what a person he was otherwise duty-bound to obey thought he should do about appellant's case at action – that is, *grant no clemency*. Moreover, the "objective, disinterested observer, fully informed of all the facts and circumstances," *Boyce*, 76 M.J. at 248, *would also know* that the convening authority knew this.

After the President's tweet, and before taking action on appellant's case (and affirming the sentence as adjudged), the convening authority said --- nothing. While

---

[33] Indeed, the CAAF's predecessor court went so far as to say that the specter of UCI was why the UCMJ was passed in the first place. *United States v. Fowle*, 7 U.S.C.M.A. 349, 22 C.M.R. 139, 142 (1956) ("It was against this sort of command influence [by the Secretary of the Navy] that the Code was initially directed.").

[34] The day-of-sentencing tweet was an official statement from the President, in his capacity as President. *See Knight First Amendment Institute at Columbia Univ. v. Trump*, No. 18-1691-cv, 2019 U.S. App. LEXIS 20265 2, at *19 (2d Cir. 9 Jul. 2019) (slip op.) ("we conclude that the factors pointing to the public, non-private nature of the [President's Twitter] Account . . . are overwhelming," and, therefore, the "President . . . acts in an official capacity when he tweets").

[35] While this could be viewed as appellant "planting" the issue of post-trial UCI which the court addresses here, it could also be viewed as a valid matter in mitigation for appellant to inform the convening authority that the President had continued to tweet about his case, to appellant's obvious detriment. Either way, the relevant issue for our purposes is that the convening authority knew about the tweet.

the convening authority provided testimony and an affidavit at an earlier proceeding regarding a different UCI claim in appellant's trial, those came months before appellant's sentencing and the President's specific and timely tweet.[36]  While the convening authority's prior affidavit and testimony are not irrelevant, in my view they do not project forward with enough force to meet the government's high burden following the President's day-of-sentencing tweet.  Nor is it dispositive to assume *arguendo*, based on the convening authority's prior testimony and affidavit, that he was not actually influenced by the tweet, as that would only address *actual* UCI, and would leave as an open question the question of the *appearance* of UCI.  On this record, it is possible that the "objective, disinterested observer, fully informed of all the facts and circumstances," would not "harbor a significant doubt about the fairness" of the convening authority's post-trial action.  *Boyce*, 76 M.J. at 248.  However, the timing, specificity, and unequivocal nature of the President's day-of-sentencing tweet make it impossible, in my view, to say this with the certainty required for the government to satisfy its "beyond a reasonable doubt" burden.

Appellant was entitled to a post-trial convening authority's action untainted by UCI.  *See, e.g., Barry*, 78 M.J. at 77-79 (dismissing with prejudice where convening authority's post-trial action tainted by UCI).  As a matter of law, at the time of action in this case, the convening authority had the unfettered discretion to provide appellant with any relief he deemed appropriate, up to and including setting aside the findings and the sentence.  UCMJ art. 60 (2012).  As a matter of fact, appellant's chances at post-trial clemency were not illusory.  The active duty Lieutenant Colonel Judge Advocate Preliminary Hearing Officer, who presided over appellant's extensive Article 32 proceeding, recommended referral of appellant's case to a "straight special" court-martial not empowered to adjudge any discharge, and further recommended no jail time.[37]  Major General Dahl, who led a team of over twenty investigators and lawyers during the pretrial AR 15-6 investigation into appellant's case likewise indicated that jail time would be "inappropriate."  In light of these recommendations from senior leaders who looked closely at appellant's

---

[36] The specificity and timeliness of the President's day-of-sentencing tweet stood in contrast to his prior statements about appellant's case, which were either old, or of a more general nature, or both.

[37] I recognize that the Article 32 preliminary hearing officer was not privy to all of the facts and circumstances of the parties' sentencing cases presented at appellant's court-martial, and that he based his recommendation in part on the fact that, at the Article 32, the government did not present any evidence of casualties.  However, the Article 32 preliminary hearing officer, as well as the Army Regulation (AR) 15-6 investigating officer, both conducted thorough and impartial investigations into appellant's behavior which led to his court-martial proceeding.  Thus, their findings and recommendations remain relevant.

case, the military judge's ultimate sentence was hardly a windfall, and it would have been conceivable that the convening authority could have provided additional clemency. Contrary to the majority's holding, I find that UCI infected that critical post-trial process.

Fashioning an appropriate remedy for the post-trial UCI in this case is difficult, and neither party's proposals provide this court with much meaningful guidance. The government has suggested remanding this case to a different convening authority for a new action. This could work in a different scenario, but not here. For example, if a two-star division commander convening authority learned, prior to action, that his three-star corps commander thought that the sentence resulting from a court-martial the division commander referred was a "disgrace" because it was too lenient, the government could simply transfer the case to a new convening authority of higher rank for action. Transferring convening authorities in this way could go a long way towards satisfying the government's burden to disprove any actual or apparent UCI beyond a reasonable doubt in such a case. But, when the influencer is the Commander-in-Chief, there is nowhere to forward the case, as any other convening authority would be in the same situation as the convening authority here. While this is certainly a conundrum for the government, it is not this court's responsibility to fix, nor does it change the government's beyond-a-reasonable-doubt burden that the law requires.

Appellant, in contrast, requests a remedy of dismissal with prejudice, and points to *Barry* in which the CAAF imposed just such a remedy for a post-trial UCI violation. 78 M.J. at 79 (noting that UCI remedies "must serve to protect the court-martial process and foster public confidence in the fairness of" the military justice system). However, even understanding that the CAAF has fashioned UCI remedies untethered from the concept of actual prejudice to an individual accused, dismissal with prejudice would be a "drastic remedy" here, and is ultimately unwarranted. *Id.* Appellant both pleaded guilty at trial, and requested that the military judge sentence him to a dishonorable discharge.

We are left with no perfect resolution to appellant's case. Ultimately, I am compelled to look to guidance on remedy from a phase of this case that occurred well prior to the President's day-of-sentencing comments, and thus was completely free from any actual or apparent UCI from those remarks. Specifically, the Article 32 preliminary hearing officer's recommendation that appellant's case be referred to a "straight special" court-martial not empowered to adjudge a discharge, and that jail time would be inappropriate, was rendered in October of 2015. The AR 15-6 investigating officer, MG Dahl, likewise recommended no jail time for appellant during the same time period. Setting aside appellant's dishonorable discharge would bring his current sentence into line with these two recommendations, and thus purge the taint of post-trial UCI that emanated from the President's day-of-sentencing tweet.

In summary, because I would: (1) find that the convening authority's post-trial action was not free from UCI; and (2) set aside appellant's dishonorable discharge, I respectfully dissent from the majority opinion.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court